UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

RACHELLE M. DITTY,                    )
                                      )
          Plaintiff,                  )
                                      )
          v.                          )
                                      )          Case No. 1:11-cv-01348-TWP-MJD
STATE OF INDIANA,                     )
                                      )
          Defendant.                  )

ENTRY ON MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendant the State of Indiana's ("the State") Motion

for Summary Judgment (Dkt. 38).  Plaintiff Rachelle Ditty ("Ms. Ditty") alleges she was

discriminated and retaliated against on the basis of her gender while employed by the State at

Richmond State Hospital ("Richmond").  She brings claims under 42 U.S.C. § 2000 ("Title VII")

and under the Civil Rights Act of 1991, 42 U.S.C. § 1981 ("§ 1981").  Also before the Court is

the State's Motion to Strike Sections of Plaintiff's Surreply (Dkt. 59).  For the reasons set forth

below, the State's motion to strike is **GRANTED**, and the State's motion for summary judgment

is **GRANTED in part** and **DENIED in part.**

## I.  BACKGROUND

The following facts are presented in the manner most favorable to Ms. Ditty as the non-

moving party.  Ms. Ditty began working for Richmond as a psychiatric attendant on April 12,

2010.  Richmond is a psychiatric treatment facility operated by the State of Indiana. Ms. Ditty's

job was to tend to mentally ill residents, remind them of their classes, watch over them, keep an

eye on their health and hygiene, and attend outside appointments with the residents.  Ms. Ditty

was supervised by Psychiatric Attendant Supervisor Mike Lowden ("Mr. Lowden") for her

attendance and administrative matters, and was supervised by Charge Nurse Rick Callahan ("Mr. Callahan") in her day to day activities and in her evaluations.[1]

Ms. Ditty alleges she was subject to sexual harassment by her supervisor and other male coworkers.  She alleges that a co-worker, qualified medical aide[2] Jeff Moore ("Mr. Moore"), showed her pornographic pictures and messages that he kept on his cell phone, and that he kicked her in the buttocks.  Her supervisor, Mr. Callahan, subjected her to harassment by using profane and offensive language by making comments to a maintenance worker that he wanted to have sexual relations with her.  And Mr. Callahan would brush up against her in ways that he did not do to other employees, and would put his hand on the small of her back while maneuvering through tight spaces.

On October 13, 2010, Ms. Ditty was involved in an incident with one of the patients at the hospital.  Richmond utilizes a procedure called "bridge building" in order to restrain patients who become aggressive.  The leader positions themself in front of the patient and signals to the other workers that he or she is in need of assistance.  During the incident, a patient became aggressive and made verbal threats against Ms. Ditty, but her two male coworkers stood by and did not come forward to assist her.  In a meeting with the Assistant Director of Nursing Patty Bostic ("Ms. Bostic") following the incident, Ms. Ditty was reprimanded for improper use of the bridge building technique and was ordered to attend additional training.  Ms. Ditty complained to Ms. Bostic about inappropriate conduct by Mr. Callahan and the two male attendants who failed to assist her with the patient.

---

[1] Prior to being supervised by Mr. Callahan, Ms. Ditty was supervised by Charge Nurse Patricia Bell until August 23, 2010, when Ms. Bell unexpectedly passed away.

[2] Qualified medical aids performed essentially the same job as the psychiatric assistants.

On October 16, 2010, Mr. Callahan completed a performance evaluation for Ms. Ditty and requested that her initial six-month probationary period, which had already ended on October 12, 2010, be extended for an additional six months as a result of the October 13, 2010 incident.  It was the State's policy that if an extension of a new hospital employee's probationary period was warranted, the employee must be given an evaluation in the fourth month of the employee's "working test" period, and the request for extension should be made at least six weeks prior to the expiration of the initial probation period.    However, the evaluation and request to extend Ms. Ditty's probation period was not made until four days after her probation period ended.  Mr. Callahan told Ms. Ditty that she should think about who is completing her evaluations before making complaints to his supervisor, Ms. Bostic.  Ms. Ditty met with Ms. Bostic and Director of Nursing Gretchen Gibbs ("Ms. Gibbs") in November 2010 to discuss the extension of her probation period and her difficulties with Mr. Callahan.  Ms. Gibbs offered to transfer Ms. Ditty to another unit to address her concerns with Mr. Callahan, but she declined.

On February 16, 2011, an incident occurred in which Ms. Ditty and several other attendants were discussing the use of a wrist brace.  Chris Cook ("Mr. Cook"), another nursing attendant, made a remark about whether the brace's box said it was reversible and questioned whether women knew how to use a wrist brace.  Ms. Ditty remarked that Mr. Cook had made a "sexist comment."    Mr. Callahan immediately called a meeting with Ms. Ditty and his supervisor, Candace Harlan ("Ms. Harlan"), to discuss Ms. Ditty's comment because he considered it to be a serious allegation against Mr. Cook.  Ms. Ditty said that her comment about Mr. Cook on that day was a joke, but Ms. Ditty also mentioned that Mr. Cook and other male co-workers frequently made sexist comments at work.  Ms. Ditty became extremely upset during the meeting, and Ms. Harlan offered to let her leave work early for the evening.  Ms. Harlan sent a

written narrative to Ms. Gibbs summarizing the meeting, including Ms. Ditty's allegations that co-workers frequently made sexists comments and that Ms. Ditty had spoken disrespectfully to Mr. Callahan.  Ms. Harlan later met with Ms. Gibbs and Ms. Bostic, and the decision was made to terminate Ms. Ditty's employment.

On February 20, 2011, Ms. Ditty met with Ms. Gibbs and Human Resources Manager April Craig to discuss her employment.  During the meeting, Ms. Ditty made accusations of sexually inappropriate comments by coworkers, including her supervisor Mr. Callahan. However, the decision had already been made to terminate Ms. Ditty's employment, which became effective on or about February 20, 2011.[3]  Ms. Gibbs claims that Ms. Ditty was terminated because of unauthorized leave time, prohibited cell phone use, inappropriate interactions with a patient, issues with supervisors, tardiness, absence issues, and overall poor behavior.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor."  *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).  However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations,

---

[3] Although the notice of termination is dated February 20, 2011, the parties dispute whether the termination occurred on February 20 or February 21; the Court finds this dispute to be immaterial.

4

that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted).  "In much the same way that a court is not required to scour the record in search of evidence to defeat the motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted).  "[N]either the mere existence of some alleged factual dispute between the parties . . . nor the existence of some metaphysical doubt as to the material facts . . . is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

Ms. Ditty mistakenly argues that the State applied the wrong standard of review in its motion.  Ms. Ditty is correct that the Court is required to view evidence in the light most favorable to the non-movant, Ms. Ditty, and that is the standard applied by the Court.  However, the State is not required to argue its own case in the light most favorable to Ms. Ditty.

### III.    DISCUSSION

#### A.    Motion to Strike Portions of Ms. Ditty's Surreply

As an initial matter, the State objects to portions of Ms. Ditty's surreply (Dkt. 58) and has moved to strike pages 1 through 2 and 6 through 16 on the basis that those portions exceed the scope permitted by Southern District of Indiana Local Rule 56.1(d).[4]  The State argues that Ms. Ditty has presented no new evidence, but instead the surreply is merely a rehash of arguments previously made or waived, and she has mistakenly characterized arguments of the State as "argumentative" objections.  Although the Court always tries to allow litigants a full and fair opportunity to respond to arguments made by their adversary, including allowing surreplies, *see*, *e.g.*, *Pike v. Caldera*, 188 F.R.D. 519, 535–36 (S.D. Ind. 1999), some portions of the surreply are not allowed under the local rules.  The Court agrees with the State that the surreply must be

---

[4] Effective January 1, 2012 this section was renumbered as Local Rule 56-1(d).

limited to new evidence and objections; therefore, the State's Motion to Strike Sections of Plaintiff's Surreply (Dkt. 59) is **GRANTED**.  The Court will consider Ms. Ditty's surreply only to the extent consistent with Local Rule 56–1(d).

**B.** **Section 1981 Claim**

In her Complaint, Ms. Ditty has alleged discrimination in violation of 42 U.S.C. § 1981. However, Ms. Ditty has only alleged that she was discriminated against on the basis of her sex. Claims of sex discrimination are not cognizable under § 1981, as this section applies only to alleged discrimination on the basis of race or alienage. *Runyon v. McCrary*, 427 U.S. 160, 167 (1976); *St. Louis v. Alverno Coll.*, 744 F.2d 1314, 1315 (7th Cir. 1984); *Friedel v. City of Madison*, 832 F.2d 965, 966 n.1 (7th Cir. 1987).  Therefore, the State's Motion for Summary Judgment as to Ms. Ditty's § 1981 claim is **GRANTED**.

**C.** **Title VII Sex Discrimination Claims**

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Ms. Ditty includes two counts in her Complaint, one for sex discrimination and the second for retaliation.  As part of her sex discrimination claim, Ms. Ditty argues that she was subject to a hostile work environment and that she was treated differently from similarly situated male employees.  The Supreme Court has held that a claim of hostile environment sexual harassment is a form of sex discrimination actionable under Title VII.  *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986). Although Ms. Ditty does not clearly delineate these two claims in her Complaint or her briefs, the Court finds that the claims have been properly pled and argued, and will address each in turn.

1.       **Hostile Work Environment**

Ms. Ditty alleges that she was sexually harassed by being exposed to sexual talk, sexual advances, sexist comments, descriptions of sexual acts, pornography, physical threats, and inappropriate physical touching.  (Dkt. 1.)   The same standards are used to evaluate sexual harassment as are used for racial harassment claims.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 n.10 (2002).   In order to prevail on a hostile work environment claim, the plaintiff must show that the conduct at issue "was both subjectively and objectively so severe or pervasive as to alter the conditions of employment and create an abusive working environment." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 975 (7th Cir. 2004) (quotations omitted). "'[R]elatively isolated' instances of non-severe misconduct will not support a hostile environment claim." *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 533 (7th Cir. 1993) (quoting *Weiss v. Coca-Cola Bottling Co. of Chi.*, 990 F.2d 333, 337 (7th Cir. 1993)).

To survive summary judgment on a hostile work environment claim, Ms. Ditty must provide sufficient evidence to create a material issue of fact as to four elements: (1) the work environment was both subjectively and objectively offensive; (2) her gender was the basis for the harassment; (3) the conduct was severe or pervasive; and (4) there is a basis for the State's liability. *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010).  When evaluating a hostile work environment claim, courts will not focus on discrete acts of individual employees, but must consider the entire context of the workplace. *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011).  Not all workplace unpleasantries give rise to liability under federal civil rights laws, which do not guarantee a perfect work environment. *Vore v. Ind. Bell Tel. Co., Inc.*, 32 F.3d 1161, 1162 (7th Cir. 1994).

Ms. Ditty has not shown that she can satisfy any of the four elements of a *prima facie* case for her hostile work environment claim.  First, with regard to the first and third elements, the Court finds that no reasonable jury could find that the work environment at Richmond was objectively offensive, nor find that the conduct was severe or pervasive.   Ms. Ditty admits that Mr. Callahan never made any sexually harassing comments directly to her.  Dkt. 52 at 11; Dkt. 53-1 at 15, 51:20–53:19.   Courts have held that comments not made directly to the plaintiff, while offensive, are not actionable under Title VII.   *Eversole v. Spurlino Materials of Indianapolis*, 804 F. Supp. 2d 922, 935 (S.D. Ind. 2011) (citing cases).  The other incidents cited by Ms. Ditty are relatively isolated, including seeing pornographic messages on a co-worker's telephone, being kicked in the buttocks by a co-worker, being brushed up against by her supervisor, and being verbally threatened by a psychiatric patient.  While likely inappropriate, they do not rise to the level of creating an objectively hostile work environment, nor was the conduct severe or pervasive as a matter of law.  *See Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997) ("The occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers would be neither pervasive nor offensive enough to be actionable.").

Ms. Ditty also cannot satisfy the second prong of her *prima facie* case by showing that the alleged harassment that she was personally privy to was based upon her gender.   The pornographic images and texts that were on Mr. Moore's phone were shown to everyone working at the nurse's station, not just Ms. Ditty.  Dkt. 53-1 at 23, 84:5–85:7.  With regard to the two male co-workers failing to come to her assistance with a patient, Ms. Ditty has not presented any evidence, beyond her own speculation, that this failure to assist her was based upon her gender.   There has also been no evidence presented that the verbal attack by the psychiatric

patient was based upon Ms. Ditty's gender.  Thus, Ms. Ditty cannot satisfy the second prong of her *prima facie* case of hostile work environment discrimination.

Finally, Ms. Ditty has not presented a question of material fact as to the State's liability for the aforementioned conduct.  An employer is not automatically liable for harassing behavior by co-workers; rather, employers are only liable where they do not "promptly and adequately respond to employee harassment."  *Sutherland v. Wal-Mart Stores, Inc.*, 632 F.3d 990, 994 (7th Cir. 2011).  "[F]or purposes of Title VII hostile work environment liability based on negligence, whether the potential harasser is an employee, independent contractor, or even a customer is irrelevant: 'The genesis of inequality matters not; what *does* matter is how the employer handles the problem.'"  *Erickson v. Wis. Dept. of Corr.*, 469 F.3d 600, 605 (7th Cir. 2006) (quoting *Dunn v. Washington Cnty. Hosp.*, 429 F.3d 689, 691 (7th Cir. 2005)).

Viewing the facts most favorable to Ms. Ditty, the Court accepts that Ms. Ditty made Richmond aware of the incidents of alleged harassment.  In response, Ms. Gibbs and Ms. Bostic offered to remedy the situation by transferring Ms. Ditty to another unit in November 2010, following her complaints, but Ms. Ditty declined.  (See Dkt. 39-9 at 11.)  Thus, even if Ms. Ditty could satisfy the other elements of her *prima facie* case, she cannot show that there is a basis for holding the State liable for the conduct because she failed to take advantage of the remedy offered to her.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).  Therefore, the Court finds that Ms. Ditty has not presented sufficient questions of material fact regarding her allegations that she was subject to a hostile work environment on the basis of her gender, and the State's motion for summary judgment as to Ms. Ditty's hostile work environment claim is **GRANTED**.

##### 2.      Disparate Treatment

Ms. Ditty also alleges that she was treated less favorably than male employees at Richmond due to her gender.  "An employee alleging sex discrimination can either proceed directly, by presenting direct and/or circumstantial evidence on the issue of discriminatory intent, or indirectly, by utilizing the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting method."  *Wyninger*, 361 F.3d at 978.   If the plaintiff cannot present direct evidence of discrimination, she must proceed under the indirect method.  To establish a prima facie case of sex discrimination under the indirect method, the plaintiff must demonstrate that: (1) she is a member of the protected class; (2) her performance met her employer's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) similarly-situated employees outside the protected class received more favorable treatment.  *Id.* (citing *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 885–86 (7th Cir. 2001)).   Once the prima facie case is established, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the adverse employment action.  *Wyninger*, 361 F.3d at 978-79.  If the defendant is successful in rebutting the plaintiff's *prima facie* case with a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to establish the reason proffered by the defendant was pretextual.  *Id.* at 979.  "The employer's explanation can be foolish or trivial or even baseless so long as the company honestly believed in the reasons it offered for the adverse employment action." *Id.*

##### a.      Ms. Ditty's Prima Facie Case

Because Ms. Ditty has not presented any direct evidence of discrimination, she must prove her case using the indirect, burden-shifting method under the *McDonnell Douglas* framework.  The parties do not dispute that as a female whose employment was terminated, Ms.

Ditty satisfies the first and third prongs of her *prima facie* case. This leaves only the questions of whether she was meeting Richmond's legitimate employment expectations, and whether a similarly situated employee outside of her protected class was treated more favorably.

With regard to whether Ms. Ditty met her employer's legitimate employment expectations, there is a question of material fact. The State argues that Ms. Ditty was not meeting Richmond's legitimate employment expectations because of her inappropriate interaction with the patient who threatened her, use of unauthorized leave time, a violation of Richmond's cell phone usage policy, poor interaction with supervisors, tardiness, and overall poor behavior. However, Ms. Ditty has shown that her performance reviews prior to her termination were positive and indicated that she was improving in the areas in which she had previously been deficient, and her last performance evaluation indicated that she did not need improvement in any areas. Dkt. 53-2 at 27-30. She also had a recent "positive fact file" showing that she was going "above and beyond" in her work. Dkt. 53-2 at 27. In addition, Ms. Ditty has presented evidence that her poor performance evaluation following the incident with the patient may have been based upon retaliation for her complaints about her supervisor, Mr. Callahan. Dkt. 53-1 at 24, 87:13–88:4. Therefore, the Court finds that Ms. Ditty has presented a sufficient question of material fact on the second prong of her *prima facie* case as to whether she was meeting Richmond's legitimate employment expectations.

With regard to the fourth prong of her *prima facie* case, Ms. Ditty has also presented a question of material fact as to whether an employee outside of her protected class was treated more favorably in response to similar conduct. "Whether a comparator is similarly situated is usually a question for the fact-finder, and summary judgment is appropriate only when no reasonable fact-finder could find that plaintiffs have met their burden on the issue." *Coleman v.*

*Donahoe*, 667 F.3d 835, 846-47 (7th Cir. 2012) (internal quotations and citations omitted). There is no definitive formula for making this determination; rather, courts must examine "all relevant factors, including whether the employees '(i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications – provided the employer considered these latter factors in making the personnel decision.'" *Warren v. Solo Cup Co.*, 516 F.3d 627, 631 (7th Cir. 2008) (quoting *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005) (additional citations omitted)). "Which factors are material is a case-specific inquiry that depends on the specifics of the defendant's decision and the stated reason for it." *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 675–76 (7th Cir. 2012). However, in cases involving differential discipline, "[t]he question is not whether the employer classified the comparators in the same way, 'but whether the employer subjected them to different employment policies.'" *Coleman*, 667 F.3d at 848 (quoting *Lathem v. Dep't of Children & Youth Svcs.*, 172 F.3d 786, 793 (11th Cir. 1999)). Thus, the more relevant comparison between employees in these cases is their alleged misconduct, performance standards, and disciplining supervisor rather than their job description and duties. *Coleman*, 667 F.3d at 849.

The State argues Ms. Ditty has not identified a similarly-situated individual outside of her protected class who received relatively better treatment. Ms. Ditty's supervisor, Ms. Gibbs, stated that Ms. Ditty was terminated because of inappropriate cell phone use, inappropriate interactions with a patient, issues with supervisors, tardiness, absence issues, and overall poor behavior. Dkt. 41-3 at 2, ¶ 12. However, Ms. Ditty provides evidence that another male psychiatric attendant, Chris Cook, may have been disciplined less harshly for similar rule and

policy violations.[5]  Mr. Cook held the same position as Ms. Ditty as psychiatric attendant; was subordinate to the same supervisors, Ms. Gibbs and Ms. Bostic; was subject to the same hospital rules and disciplinary policies; and had similar alleged misconduct, including cell phone violations, unauthorized leave, inappropriate conduct with a patient, and conflict with another employee.  The State argues Mr. Cook is not an adequate comparator because he was terminated for the same reasons as Ms. Ditty, which was for possession of a cell phone in violation of Richmond's policy.  However, there is evidence that Mr. Cook was not terminated for the cell phone violation itself, but for repeated policy violations which, in accordance with Richmond's progressive disciplinary policy, subjected him to termination.  Dkt. 53-3 at 30.  The evidence shows that Mr. Cook was finally terminated after receiving *eight* pre-deprivation hearings for various acts of misconduct, and that the cell phone policy violation was his second violation of this nature.  Dkt. 53-3 at 30-31, 35.  On the other hand, Ms. Ditty was summarily dismissed, allegedly for the accumulation of reasons stated in Ms. Gibbs's affidavit, whereas Mr. Cook, prior to his termination, was afforded a pre-deprivation hearing resulting in a thirty day suspension without pay pending dismissal, with the right to appeal the decision within that thirty days.[6]  The Supreme Court has made clear that an allegation that a similarly situated employee engaged in acts of comparable seriousness received more favorable treatment is adequate to plead an inferential case of discrimination under the *McDonnell Douglas* standard.  *Coleman*,

---

[5] Ms. Ditty also briefly mentions another possible comparator in her Statement of Facts in Dispute, Jeff Moore. The State alleges that Ms. Ditty was terminated, in part, due to violations of Richmond's cell phone usage policy (Dkt. 53-3 at 37-38), which was caught on Richmond's video surveillance system.  However, Ms. Ditty alleges that Mr. Moore used his cell phone at the nurse's station to show other employees pornographic images and messages, but there is no indication that he was disciplined for violating the cell phone usage policy.  However, Ms. Ditty does not further address this employee in detail in her disparate treatment arguments, so neither will the Court.

[6] Although not addressed by the parties, the Court recognizes that Ms. Ditty was arguably still in her probation period at the time of her termination, meaning that the State had the right to release her at will.  Dkt. 53-3 at 39. However, as discussed below, there is a question of fact as to whether her probation period was properly extended, thus whether she was disciplined in accordance with Richmond's policies still remains a question of material fact. Additionally, there is evidence showing that even probationary employees were afforded pre-deprivational hearings prior to being disciplined.  Dkt. 39-5 at 1.

667 F.3d at 850 (citing *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 n.11 (1976)). Thus, the Court finds that Ms. Ditty has presented a question of material fact as to the third prong of her *prima facie* case.

### b.   Evidence of Pretext

In the second phase of the *McDonnell Douglas* analysis, the Court must determine whether the State has proffered a legitimate, non-discriminatory reason for its decision to terminate Ms. Ditty. "At this stage, the employer is not required to 'prove that it was actually motivated by the proffered reason. Rather, an employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus.'" *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 725 (7th Cir. 2005) (quoting *Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001 (7th Cir. 2000)). Once the State has put forth that reason, the burden is then on Ms. Ditty to show that the proffered reason is pretext for sex discrimination. *Rudin*, 420 F.3d at 724.

The State argues that Richmond had a legitimate, non-discriminatory reason for terminating Ms. Ditty's employment and has presented documentation for these policy violations, thus meeting their burden. Dkt. 39. However, Ms. Ditty has presented evidence showing that there is a question of fact as to whether the proffered reason is pretext. The Seventh Circuit has held that an employer's failure to follow its own internal employment procedures can constitute evidence of pretext. *Id*. at 727. Ms. Ditty argues that Richmond failed to follow its own internal policies in extending her probation period after the expiration of her initial probation period, subjecting her to differing disciplinary procedures. According to the policy, new employees are subject to a six month "working test" period, and for employees who have successfully completed this probation period, a six-month performance appraisal is

14

completed no later than ten days prior to the date when the employee has reached six months of employment.  Dkt. 53-2 at 3.  In order to extend a new employee's working test period, the policy states

> the supervisor *shall* request the six month appraisal in the fourth month of employment.  A completed Performance Appraisal, which indicates the necessity of an extension, *must* be returned to the Human Resources Department four weeks prior to the time the employee would have reached 6 months of employment.

Dkt. 53-2 at 3 (emphasis added).  Richmond failed to follow this policy in extending Ms. Ditty's probationary period by requesting the extension on October 16, 2010, four days *after* her initial period had already ended on October 12, 2010, and in its failure to provide the human resources department with a performance appraisal before the end of her probation period.  This presents a question of fact as to whether Richmond validly extended her probation period, thus subjecting her to harsher discipline for conduct similar to that of Mr. Cook's, and whether this is indicative of pretext for discrimination.

       This further raises the question as to whether Richmond properly followed its own established disciplinary procedures in terminating Ms. Ditty.   According to Richmond's disciplinary policy, the procedure for addressing "Group I" violations for probationary employees first includes documented verbal counseling regarding shortcomings in performance, and failure to demonstrate successful job performance within a prescribed timeframe may then result in termination.  Dkt. 53-3 at 39.  Ms. Ditty's alleged violations arguably fell within the Group I classification, for which she was counseled at the time the violations occurred, and her most recent performance evaluation prior to her termination showed that she had made improvements in all of her deficient areas, meaning that she had adequately demonstrated successful job performance and thus should not have been subject to termination.  Dkt. 53-2 at 30.  However, if Ms. Ditty should have been considered a non-probationary employee based

upon Richmond's established policies, the disciplinary policy states that Richmond should utilize progressive disciplinary action with termination occurring on the fourth occasion of misconduct. Dkt. 53-3 at 37-39.   Under both scenarios, there are sufficient questions of fact on the issue of whether the State properly terminated Ms. Ditty in accordance with their stated policies for both probationary and non-probationary employees, casting doubt on the State's proffered reason for Ms. Ditty's termination, such that summary judgment in favor of the State would be inappropriate.

Because Ms. Ditty has shown that there are questions of material fact as to whether she was subject to disparate treatment on the basis of her gender, and as to whether the proffered reason for her dismissal was pretext, the State's motion for summary judgment on Ms. Ditty's disparate treatment discrimination claim is **DENIED**.

**D.     Title VII Retaliation Claim**

In Count II of her Complaint, Ms. Ditty alleges that the State retaliated against her by terminating her after she complained about sexual harassment.  Title VII also prohibits an employer from acting in retaliation against employees who lawfully seek to or actually do participate in the process of investigating or pursuing a Title VII discrimination claim.  42 U.S.C. §2000e-3(a).   Protection under the anti-retaliation provision of Title VII is not lost simply because an employee is mistaken about the merits of her charge.  *Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 892 (7th Cir. 2004); *Sweeney v. West*, 149 F.3d 550, 554 (7th Cir. 1998) ("[A]n employee may complain (in good faith) without the added burden of having to be right.").   To prevail, "she need only show that, when instituting her grievance, she had a 'sincere and reasonable belief' that she was opposing an unlawful practice." *Magyar v. St. Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 771 (7th Cir. 2008) (quoting *Hamner v. St. Vincent Hosp. & Health Care*

*Ctr., Inc.*, 224 F.3d 701, 706-07 (7th Cir. 2000)).  The parties do not dispute whether Ms. Ditty actually believed that she was being subject to unlawful discrimination, and the Court has found no reason to doubt the sincerity of Ms. Ditty's complaints to her employer.

A plaintiff may establish a *prima facie* case of retaliation using either the direct or indirect method.   *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 642 (7th Cir. 2002).  Under the direct method, the plaintiff must present direct evidence of:  (1) a statutorily protected activity; (2) an adverse action taken by the employer; and (3) a causal connection between the two.  *Id.* at 644.  Under the indirect method, the plaintiff must show that: (1) she engaged in a statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite her satisfactory job performance, she suffered an adverse action from the employer; and (4) she was treated less favorably than similarly situated employees who did not engage in a statutorily protected activity.  *Id.*; *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 531 (7th Cir. 2003).  Under this method, once the plaintiff establishes these elements, the burden shifts to the defendant to come forward with a legitimate reason for the adverse employment action.  *Haywood*, 323 F.3d at 531.  Once the defendant presents a legitimate, non-invidious reason for the adverse employment action, the burden shifts back to the plaintiff to show that the defendant's reason is pretextual.  *Id.*

### 1.    Ms. Ditty's Prima Facie Case

Ms. Ditty has not offered any direct evidence to support her retaliation claim, so she must proceed under the indirect method.  The State argues that Ms. Ditty cannot prove her *prima facie* case under the indirect method because she cannot show that she engaged in a statutorily protected activity, that she was not meeting the legitimate expectations of Richmond, that she was not subject to an adverse employment action, and that she has not identified a similarly

situated employee that was treated relatively better than she was. The issues of whether Ms. Ditty was meeting Richmond's legitimate employment expectations and whether similarly situated employees were treated more favorably have already been addressed above and apply to this analysis as well; thus the only issues that the Court must address in Ms. Ditty's *prima facie* case are whether she engaged in a statutorily protected activity and whether she was subjected to adverse employment actions.

Under the first prong, the State argues that Ms. Ditty cannot show that she engaged in statutorily protected activity because she fails to show how extending her working test period, receiving a tardy, and being terminated were related to her gender. The State misapplies this prong of the test. A "statutorily protected activity" is the act of opposing or complaining about discriminating treatment in the workplace, or participating in an investigation of discriminatory treatment. *See* 42 U.S.C. § 2000e-3(a). It is not the resulting employment action that must be linked to a protected class, but rather the complaint itself. "[T]he complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected class. . . . Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) (citing *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1147 (7th Cir. 1997)); *see Miller v. Am. Fam. Mut. Ins.*, 203 F.3d 997, 1008 (7th Cir. 2000) (plaintiff did not engage in a protected activity where her complaints concerned a general displeasure with being paid less than her coworkers and not discrimination related to a protected class). Thus, the proper question is whether Ms. Ditty's complaints about her supervisor and co-workers raised the subject of sexual harassment and discrimination, or whether they were general complaints about her working conditions.

There is a question of material fact as to when Ms. Ditty first made allegations of sexual harassment, *i.e.* engaged in a statutorily protected activity, and to whom she made these complaints.   Ms. Ditty testified in her deposition that she told "several people" about the alleged sexual harassment from her supervisor, Mr. Callahan, including Mike Lowden, Patty Bostic, Gretchen Gibbs, Jill Matthews, Sara Witt and Julie Grow.   Dkt. 53-1 at 16-17, 57:22–58:14. Specifically, Ms. Ditty alleges that she informed Ms. Bostic about the sexual harassment on October 13, 2010, three days before receiving a negative performance evaluation and resulting extension of her probationary "working test" period.   *Id.* at 17, 58:10–60:9.   There is also reference to "retaliation" in the e-mail exchanges between Ms. Grow and Ms. Witt in Richmond's human resources department regarding Ms. Ditty's performance assessment, which when viewed in light most favorable to Ms. Ditty, raises the factual question of whether Richmond was made aware of Ms. Ditty's complaints about sex discrimination and whether she informed Richmond that she believed that Mr. Callahan had retaliated against her for making complaints about his behavior by extending her probation period.   Dkt. 53-2 at 15.   Furthermore, there is deposition testimony from both Mr. Callahan and Ms. Harlan indicating that Ms. Ditty may have complained to both of them about co-workers making sexist comments, which was later communicated to Ms. Gibbs, shortly before Ms. Gibbs terminated Ms. Ditty.   Dkt. 53-7 at 13-15, 45:24-50:13; Dkt. 53-9 at 6, 17:2-25.   Thus, Ms. Ditty has raised a sufficient question of material fact as to whether she engaged in a statutorily protected activity.

Under the fourth prong, the State argues that it did not take any adverse employment actions against Ms. Ditty because there were no actions that would have dissuaded her from making or supporting a charge of discrimination.   However, Ms. Ditty alleges Richmond took several adverse actions against her after she complained about sexual harassment, including

extending her probationary period, being written up for being tardy when she was not tardy, poor performance evaluation, failure to transfer her to a different unit, and termination. "While the definition of 'adverse employment action' may be slightly more expansive in the context of a retaliation claim, the fact is that the action must be 'materially adverse' and must carry with it 'tangible job consequence[s].'" *Valcarcel v. Social Dev. Comm.*, No. 08-CV-1009, 2010 WL 3386592, at *7 (E.D. Wis. Aug. 26, 2010) (quoting *Sweeney*, 149 F.3d at 556). "In the retaliation context, an employer's action will be actionable under § 2000e-3(a) if it would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 648 (7th Cir. 2005) (quoting *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005)).

Some, but not all, of the actions taken against Ms. Ditty may constitute adverse employment actions. First, the Seventh Circuit has held that a lateral transfer does not constitute an adverse employment action; likewise, the failure to laterally transfer Ms. Ditty also does not constitute an adverse employment action. *See Herrnreiter v. Chi. Hous. Auth.*, 317 F.3d 742, 744 (7th Cir. 2002). Second, unfair reprimands and negative performance evaluations, unaccompanied by some tangible job consequence, are not considered "adverse employment actions." *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 729 (7th Cir. 2001). Thus, marking Ms. Ditty as tardy, whether or not she was actually tardy, would not be considered an adverse employment action.

However, Ms. Ditty alleges that the negative employment evaluation in response to her complaints about Mr. Callahan, caused Richmond to retroactively extend her probationary "working test" period. The Seventh Circuit has suggested that, in some instances, placing an employee on probation may constitute a materially adverse employment action. *Harper v. C.R.*

*England, Inc.*, 687 F3d 297, 306 n.31 (7th Cir. 2012) (citing *Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996)).  In this case, extending Ms. Ditty's probation period may have, at a minimum, subjected her to harsher disciplinary procedures than if she had been classified as a non-probationary employee.  Undoubtedly, Ms. Ditty's termination also constitutes an adverse employment action.  Therefore, Ms. Ditty has shown that there are questions of material fact as to whether she can satisfy the fourth prong of her *prima facie* case.

### 2.      Evidence of Pretext

As previously discussed, the State has provided legitimate, non-discriminatory reasons for Ms. Ditty's termination, but again, Ms. Ditty has presented questions of material fact as to whether these reasons where pretextual based upon Richmond's failure to follow its own employment and disciplinary policies.  In addition, while "mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue," *Stone*, 281 F.3d at 644, "[w]hen an adverse employment action follows close on the heels of protected expression, and the plaintiff can show that the person who decided to impose the adverse action knew of the protected conduct, the causation element of the *prima facie* case is typically satisfied." *Lalvani v. Cook Cnty., Ill.*, 269 F.3d 785, 790 (7th Cir. 2001).

In this case, Ms. Ditty alleges that Mr. Callahan was responsible for giving her the negative performance evaluation and requesting that her probation period be retroactively extended three days after she complained about his conduct to Ms. Bostic.  Ms. Ditty has also presented evidence that her termination occurred five days after her meeting with Mr. Callahan and Ms. Harlan at which she allegedly complained about sexist comments made by her supervisor and coworkers, that Ms. Gibbs was made aware of these complaints, and that Ms.

Gibbs was the person who decided to terminate her. *Cf. Id.* (year and a half lapse between protected conduct and adverse employment action would not allow a reasonable jury to conclude that termination was causally related); *Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390 (7th Cir. 1999) (four month delay negates causal inference); *Davidson v. Midelfort Clinic*, 133 F.3d 499 (7th Cir. 1998) (no causal inference where employee was terminated five months after filing EEOC complaint, even though complaint was still pending); *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003 (7th Cir. 2000) (no causal inference after a year). Thus, Ms. Ditty has raised questions of material fact with regard to whether the State's proffered reasons for her discipline and termination were pretext, and has shown that there are factual questions with respect to causation that make summary judgment inappropriate. Therefore, the State's motion for summary judgment with respect to Count II of Ms. Ditty's Complaint alleging retaliation in violation of Title VII is **DENIED**.

## IV.   CONCLUSION

For the foregoing reasons, the State's Motion to Strike Sections of Plaintiff's Sur-Reply (Dkt. 59) is **GRANTED**. The State's Motion for Summary Judgment (Dkt. 38) is **GRANTED in part** as to Ms. Ditty's claims brought under § 1981 and her Title VII hostile work environment claim, and **DENIED in part** as to Ms. Ditty's Title VII disparate treatment and retaliation claims.

**SO ORDERED.**

Date: 04/17/2013

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

22

DISTRIBUTION:

Richard L. Darst
COHEN GARELICK & GLAZIER
rdarst@cgglawfirm.com

Laura Lee Bowker
OFFICE OF THE INDIANA ATTORNEY GENERAL
laura.bowker@atg.in.gov

Don R. Hostetler
OFFICE OF THE INDIANA ATTORNEY GENERAL
donald.hostetler@atg.in.gov

Erica Sue Sullivan
OFFICE OF THE INDIANA ATTORNEY GENERAL
erica.sullivan@atg.in.gov